GLENVIEW CONSTRUCTION COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HARRY C. AND MARGARET F. ELLIOTT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9584–79, 9585–79. Filed August 19, 1981.

*Thomas J. Courtney, Leon S. Anguire*, and *Jack R. White*, for the petitioners.

*Karen J. Simonson*, for the respondent.

WILES, *Judge*: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioner | Docket No. | Taxable year | Deficiency |
|---|---|---|---|
| Glenview Construction Co. | 9584–79 | 4/1/74 – 3/31/75 | $13,149 |
| | | 4/1/75 – 3/31/76 | 19,253 |
| Harry C. and Margaret F. Elliott | 9585–79 | 11/1/74–10/31/75 | 5,725 |

The sole issue for decision is whether certain mobile home park rental property constitutes "residential rental property" within the meaning of section 167(j)(2).[1]

## FINDINGS OF FACT

All of the facts have been stipulated and are found accordingly.

Petitioners Harry C. and Margaret F. Elliott, husband and wife, resided in Sacramento, Calif., when they filed their petition in this case. They filed a joint Federal income tax return for the taxable year ended October 31, 1975. Petitioner Glenview Construction Co. (hereinafter Glenview) is a California corporation. Its principal office was in Sacramento, Calif., when it filed its petition in this case. Glenview filed Federal corporate income tax returns for the taxable years ended March 31, 1975, and March 31, 1976. Petitioners Harry C. and Margaret F. Elliott were the majority shareholders of Glenview.

During their taxable year ended October 31, 1975, Mr. and Mrs. Elliott owned and operated a mobile home park known as the Creekside Mobile Home Park (hereinafter Creekside) in

---

[1]Unless otherwise indicated, statutory references are to the Internal Revenue Code of 1954 as amended.

San Luis Obispo, Calif. They had acquired Creekside as newly constructed property in September 1971. Creekside contains 215 mobile home sites, each consisting of a concrete slab with electric, water, and sewer hookups. It also contains a recreation building, swimming pool, and therapy pool which were available for use by the tenants. The mobile home sites were rented to tenants who owned their own mobile homes for a monthly rental of from $75 to $90. Mr. and Mrs. Elliott did not rent any mobile homes to the tenants at Creekside.

During its taxable years ended March 31, 1975, and March 31, 1976, Glenview owned and operated a mobile home park known as the Sunrise Terrace Mobile Home Estate (hereinafter Sunrise) in Arroyo Grande, Calif. Sunrise was newly constructed property when Glenview acquired it in May 1974. Sunrise contains 300 mobile home sites, each consisting of a concrete slab with electric, water, and sewer hookups. It also contains a recreation building, swimming pool, therapy pool, and tennis courts which were available for use by the tenants. The mobile home sites were rented to tenants who owned their own mobile homes for a monthly rental ranging between $50 and $110. Glenview did not rent any mobile homes to the tenants at Sunrise.

On their return for the taxable year ended October 31, 1975, Mr. and Mrs. Elliott claimed a depreciation deduction of $40,214 on the Creekside concrete slabs, using the 200-percent declining balance method over a 25-year useful life.[2] On its returns for the taxable years ended March 31, 1975, and March 31, 1976, Glenview claimed depreciation deductions of $109,577 and $110,772, respectively, on the Sunrise concrete slabs, using the 200-percent declining balance method over a 25-year useful life. In the statutory notices of deficiencies, respondent determined that petitioners were not entitled to use the 200-percent declining balance method of depreciation on the concrete slabs because such property did not constitute residential rental property within the meaning of section 167(j)(2). Therefore, respondent redetermined the allowable depreciation on the concrete slabs under the 150-percent declining balance method.

---

[2]Mr. and Mrs. Elliott have used the 200-percent declining balance method of depreciation on the concrete slabs since they acquired Creekside.

OPINION

We must decide whether the concrete slabs that petitioners rented to the tenants of their respective mobile home parks constitute residential rental property within the meaning of section 167(j)(2).

Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business or held for the production of income. Section 167(b) sets forth the permissible methods of depreciation and specifically authorizes the declining balance method, using a rate not exceeding twice the straight line rate (200-percent declining balance method). With respect to section 1250 property,[3] however, section 167(j)(1)[4] provides that the methods permitted by subsection (b) shall not apply and limits the use of the declining balance method to a rate not exceeding 150 percent of the straight line rate. Section 167(j)(2),[5] on the other hand, provides an exception to section

---

[3]Sec. 1250(c) provides that the term "section 1250 property" means any real property (other than sec. 1245 property) which is or has been property of a character subject to the allowance for depreciation provided by sec. 167.

[4]Sec. 167(j)(1) states as follows:

(1) GENERAL RULE.—Except as provided in paragraphs (2) and (3), in the case of section 1250 property, subsection (b) shall not apply and the term "reasonable allowance" as used in subsection (a) shall include an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

(A) the straight line method,

(B) the declining balance method, using a rate not exceeding 150 percent of the rate which would have been used had the annual allowance been computed under the method described in subparagraph (A), or

(C) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in subparagraph (B).

Nothing in this paragraph shall be construed to limit or reduce an allowance otherwise allowable under subsection (a) except where allowable solely by reason of paragraph (2), (3), or (4) of subsection (b).

[5]Sec. 167(j)(2) provides, in part:

(2) RESIDENTIAL RENTAL PROPERTY.—

(A) IN GENERAL.—Paragraph (1) of this subsection shall not apply, and subsection (b) shall apply in any taxable year, to a building or structure—

(i) which is residential rental property located within the United States or any of its possessions, or located within a foreign country if a method of depreciation for such property comparable to the method provided in subsection (b)(2) or (3) is provided by the laws of such country, and

(ii) the original use of which commences with the taxpayer.

167(j)(1) for a "building or structure" which is "residential rental property," thereby allowing the use of the 200-percent declining balance method with respect to such property.

Petitioners contend that the concrete slabs which they rented to the tenants of their mobile home parks constitute residential rental property under section 167(j)(2), thereby entitling them to depreciate such property under the 200-percent declining balance method. Respondent, on the other hand, maintains that the concrete slabs are not residential rental property within the meaning of section 167(j)(2), and therefore, pursuant to section 167(j)(1), petitioners must use the 150-percent declining balance method of depreciation. We agree with and hold for respondent.

Section 167(j)(2)(B), provides that "a building or structure shall be considered to be residential rental property for any taxable year only if 80 percent or more of the gross rental income from such building or structure for such year is rental income from dwelling units (within the meaning of subsection (k)(3)(C))." Under section 167(k)(3)(C), the term "dwelling unit" is defined as "a house or an apartment used to provide living accommodations in a building or structure." See also sec. 1.167(j)–3(b)(1)(i), Income Tax Regs. Thus, under the clear language of the statute, petitioners' concrete slabs do not qualify as residential rental property because no part of the rental income derived from their mobile home parks was attributable to dwelling units.[6] Petitioners' mobile home park tenants owned their own mobile homes and, in fact, provided their own living accommodations. The tenants did not rent any *dwelling units* from petitioners, but simply a place to put their mobile homes.

Nevertheless, petitioners argue that the concrete slabs should be considered residential rental property for purposes of section 167(j)(2) because the concrete slabs and the utility hookups which were provided therewith represented an integral element in the tenants' use of their mobile homes as dwelling units. Furthermore, petitioners insist that the legisla-

---

[6]On brief, respondent also argued that the concrete slabs do not qualify as residential rental property because the slabs are not "a building or structure" within the meaning of sec. 167(j)(2). Since we have decided, however, that the slabs are not residential rental property because petitioners did not receive any rental income from dwelling units, we need not reach respondent's alternative argument.

tive history underlying the enactment of section 167(j) requires this property to be treated as residential rental property. Petitioners maintain that Congress allowed residential rental property to be depreciated under the 200-percent declining balance method in order to stimulate the construction of low- to moderate-income housing. Consequently, since mobile homes represent a form of low- to moderate-income housing,[7] petitioners assert that the congressional intent to promote such housing requires their mobile homes sites to be treated as residential rental property in view of the integral role these sites play in the use of mobile homes as housing. We reject these arguments.

We must again emphasize the clear language of the relevant statutory provisions. Section 167(j)(2)(B) categorically states that 80 percent or more of the gross rental income from the property must be rental income from "dwelling units" in order for such property to qualify as residential rental property. Moreover, section 167(k)(3)(C) defines "dwelling units" in terms of the provision of living accommodations and the regulations reiterate this requirement. Sec. 1.167(j)–3(b)(1)(i) and sec. 1.167(j)–3(b)(3), Income Tax Regs. While petitioners' mobile home parks did indeed facilitate the tenants' use of their mobile homes as dwelling units, the fact remains that the tenants owned the mobile homes. Thus, the tenants owned their living accommodations and did not rent them from petitioners. Furthermore, there is nothing in the record which even suggests that any tenant could not have readily moved his mobile home to another location at any time he so desired. Consequently, there is no indication that petitioners' mobile home park facilities were indispensable to the tenants' use of their mobile homes as dwelling units. Petitioners merely rented facilities which were incidental to such use.

It is well settled that deductions are a matter of legislative grace and that a taxpayer seeking a deduction must establish that he comes within the express provisions of the statute. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Petitioners have failed to show that their concrete slabs are

---

[7]For purposes of this case, the parties have stipulated "that the rental or ownership of mobile homes should be considered to generally represent the rental or ownership of low- to moderate-income housing."

within the statutory definition of residential rental property. Therefore, we must hold that they may not use the 200-percent declining balance method of depreciation with respect to such property.

We are convinced that the legislative history of section 167(j) does not require a different result. Although Congress was concerned with stimulating the construction and rehabilitation of low-income rental housing when it enacted the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 649, 1969–3 C.B. 104, section 167(j)(2) was intended to stimulate the new construction of all forms of residential rental housing, not simply low- to moderate-income housing as argued by petitioners, while section 167(k) was specifically enacted by Congress to encourage the rehabilitation of low-income housing. H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 303–304; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 557–559. Moreover, the legislative history leaves no doubt that Congress intended to limit the higher depreciation rates allowed under section 167(j)(2) to rental housing and we believe that it is abundantly clear that petitioners did not provide any housing to their mobile home park tenants.

Finally, petitioners have advanced other arguments in support of their position herein. We have considered each of these arguments, however, and find them unpersuasive.

To reflect the foregoing,

*Decisions will be entered for the respondent.*